UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RUTH JONES-STOTT,

       Plaintiff,

       v.

KEMPER LUMBERMANS MUTUAL
CASUALTY CO., and HENRY FORD
HEALTH SYSTEM LONG TERM
DISABILITY PLAN,

       Defendants.
_____/

CASE NO. 04-CV-40263-FL
JUDGE PAUL V. GADOLA
MAGISTRATE JUDGE PAUL KOMIVES

**REPORT AND RECOMMENDATION REGARDING
PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT (Doc. Entries 24 and 33)**

I.    RECOMMENDATION: The Court should enter judgment in favor of defendants on plaintiff's ERISA claim.

II.    REPORT:

A.    *Procedural Background*

Plaintiff Ruth Jones-Stott commenced this action on September 21, 2004, pursuant to section 502 Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1132. Plaintiff alleges that defendants, Kemper Lumberman's Mutual Casualty Company (Kemper or Administrator) and Henry Ford Health System Long Term Disability Plan (the Plan), wrongfully denied her claim for disability benefits in violation of section 502(a)(1)(B), 29 U.S.C. § 1132 (a)(1)(B) (Count I), and breached their fiduciary duties in violation of section 502(a)(3), 29 U.S.C. § 1132(a)(3) (Count II). On May 3, 2005, the Court dismissed plaintiff's fiduciary duty claim for failure to state a claim upon which relief may be granted. *See* Doc. Ent. 11. Accordingly, only plaintiff's denial of benefits claim is still before the

1

Court.

The matter is currently before the Court on the parties' cross-motions for summary judgment. On February 23, 2006, defendants filed a motion for summary judgment or, in the alternative, for judgment pursuant to *Wilkins v. Baptist Health Care Sys.*, 150 F.3d 609 (6th Cir. 1998). Defendants argue that they are entitled to judgment in their favor on plaintiff's denial of benefits claims for several reasons. Specifically, defendants argue that: (1) plaintiff's short term disability benefits claim is barred under the exclusion for receipt of workers' compensation benefits; (2) plaintiff's short term disability benefits claim is barred because her physicians would not release the medical records; (3) both plaintiff's short term and long term disability benefits claims are barred because her proof of loss was untimely in both cases; and (4) the decision of the plan administrator (defendant Kemper) was not arbitrary and capricious. In the alternative, defendants contend that even if plaintiff is entitled to benefits, she is subject to the offset provisions of the Plan and the claim must be sent back to the Administrator for an "any occupation" determination.

In lieu of a response, plaintiff filed a cross-motion for summary judgment (styled as a Motion for Reversal of the ERISA Plan Administrator's Decision to Deny Long Term Disability Benefits) on March 27, 2006. In her cross-motion, plaintiff does not address any argument relating to her short term disability benefits. With respect to her long term disability benefits claim, plaintiff argues that: (1) defendants are estopped from asserting that her long term benefits claim is untimely; (2) defendants arbitrarily and capriciously applied the wrong standard for determining disability; and (3) defendants' conclusion that she could perform the essential functions of her job was arbitrary and capricious. Defendants filed a response to plaintiff's motion on April 13, 2006.

B.     *Factual Background*

    1.     *The Medical Evidence*

Plaintiff began her employment as a Care Partner at Henry Ford Health System, a hospital providing in-patient care, on April 14, 1997. Plaintiff's duties including assisting patients in feeding, bathing, ambulation, and other daily activities, as well as changing bed linens on beds occupied by patients, requiring physical moving and lifting of patients. *See* Admin. Record ("AR"), at 41, 538-39.[1] On September 19, 2001, plaintiff injured her back while attempting to move a patient. *See id.* at 222, 520. An examination on September 24, 2001, revealed some decreased range of motion, *see id.* at 222, and a spine x-ray showed minimal disc space narrowing at the L4-L5 level, as well as pseudoarticulation of the transverse process of the L5 vertebra, which could cause pain, *see id.* at 223.[2] In a follow-up examination with Dr. Eric Peterson, M.D., plaintiff was diagnosed with lumbar pain and strain. She was prescribed a muscle relaxant and pain medication, as well as ice or heat as needed. She was instructed to follow-up in one week, and in the meantime was limited to lifting no more than 25 pounds, no repetitive bending, and limited pushing and pulling. *See id.* at 225.

On October 15, 2001, plaintiff was examined by Dr. Harry Gee, M.D. Dr. Gee ordered a magnetic resonance image (MRI) of plaintiff's spine, and instructed plaintiff to continue physical therapy and to avoid lifting more than 20 pounds, excessive bending, pushing, pulling, and reaching.

---

[1] The Administrative Record filed by defendant consists of three volumes broken down into 14 exhibits. The volumes are sequentially paginated, and each page is identified by the designation "JS" followed by the page number. For ease of reference, I cite directly to the relevant page of the record, without including the "JS" designation.

[2] A brief explanation of the terminology used in discussing the medical evidence is appropriate. The spine contains thirty three vertebrae and are divided into the following categories based on the position they occupy (ordered from the top of the spine down): cervical, dorsal, lumbar, sacral, and coccygeal. Each vertebrae is numbered according to its category and its rank in order within that category. Thus, for example, L4 denotes the fourth lumbar vertebrae. Discs between vertebrae are referred to similarly; thus, for example L5-S1 indicates the disc situated between the fifth lumbar and first sacral vertebrae. *See* HENRY GRAY, ANATOMY: DESCRIPTIVE & SURGICAL 2 (T. Pickering Pick & Robert Howden eds., 15th ed. 1901).

*See id.* at 226. The October 19, 2001, MRI showed a mild disc bulge at the L4-L5 level, and narrowing at the L5-S1 level with severe compression of the thecal sac. *See id.* at 229, 524. Subsequent examinations, both by plaintiff's treating physicians and by examining physicians, in November 2001 through July 2003, resulted in similar findings and in plaintiff's doctors continuing the restrictions on her lifting, pushing, pulling, and bending. *See id.* at 177-81, 184, 186, 195, 198, 199, 230-32, 239, 243, 248, 252, 257, 259, 260, 263, 264, 266, 268, 270, 271, 272, 273, 280, 283, 285, 289, 291, 299, 320, 322, 330, 334, 335, 337, 339, 353, 355, 357, 358, 361, 363, 374, 384, 386, 387, 388, 545, 549, 551, 553, 555, 557, 559, 561, 563, 565, 567, 569, 571, 573, 575, 576, 579, 581, 583, 585, 589, 591, 593, 595, 597, 599, 601, 603, 605, 607, 609.

The administrative record reveals that there was no available job in the hospital which plaintiff could perform consistent with these restrictions. *See id.* at 252, 257, 272, 374. On January 7, 2003, plaintiff was informed that, due to the length of her leave of absence, her employment was being terminated on that date. *See id.* at 543.

  2. *Plaintiff's Disability Benefits Claim and the Additional Medical Information*

Plaintiff initially contacted Kemper regarding her injury on October 1, 2001. The intake notes prepared by Tamika Hester discuss only short term disability benefits. *See* AR, at 42-44. Plaintiff provided information regarding her job, injury, and treatment. *See id.* On October 9, 2001, plaintiff was told that sufficient medical information had not been provided to Kemper, and that she should file a worker's compensation claim. *See id.* at 48-49. Kemper's file reflects that plaintiff indicated on October 10 that she was going to file a worker's compensation claim. On November 15, 2001, it was noted that plaintiff was filing a worker's compensation claim and that insufficient medical information had been provided, and thus that the short term disability claim would be denied. *See id.* at 50. A letter was sent to plaintiff on November 13, 2001, informing her of this determination. *See*

4

*id.* at 51.

On April 23, 2003, plaintiff contacted Kemper regarding long term disability benefits, indicating that she wished to apply for such benefits because her worker's compensation had been terminated. *See id.* at 17. On April 28, 2003, Kemper sent to plaintiff a letter indicating that her long term disability elimination period ended on March 24, 2003,[3] and that she should therefore begin the process of applying for long term disability benefits. Enclosed with the letter were the application for long term disability benefits, as well as other forms necessary to process plaintiff's claim. *See id.* at 52-55. The letter was sent to plaintiff by overnight delivery. *See id.* at 56-57. Plaintiff returned the application on April 30, 2003. *See id.* at 29-40.

On May 30, 2003, Kemper sent a letter to Henry Ford Hospital and to plaintiff's treating physicians requesting medical records relating to plaintiff's disability. *See id.* at 62-63, 65-66. On the same date Kemper sent a letter to plaintiff informing her that she had failed to sign the medical release authorization form, and providing her with new form. *See id.* at 64. Plaintiff returned the signed form on June 3, 2003. *See id.* at 69-70. On June 13, 2003, Kemper sent second requests for medical records to Henry Ford Hospital and plaintiff's treating physicians. *See id.* at 73-78. Kemper received the medical records on June 20, 2003. *See id.* at 22.

Dr. Robert Ennis, M.D., an orthopaedic surgeon, reviewed the claim for Kemper on June 30, 2003, considering the *Dictionary of Occupational Titles* job description for plaintiff's work, the Kemper case notes, and the medical records. *See id.* at 211-13. Dr. Ennis determined that the medical evidence "fail[ed] to support functional impairment(s) that precludes work." *Id.* at 212. Dr. Ennis

---

[3]As relevant to plaintiff's claim, under the Plan the long term benefit qualifying period began 180 days after the date of disability. *See* Compl., Ex. A, at 9. The March 24, 2003, date provided in Kemper's letter to plaintiff was based on the mistaken assumption that plaintiff's disability began on September 24, 2002, rather than September 24, 2001.

noted the absence of objective medical evidence supporting plaintiff's complaints of disabling pain, as well as the beliefs of plaintiff's treating physicians that she could return to work with lifting restrictions. *See id.* at 212. Dr. Ennis concluded that plaintiff was neither "continuously disabled, nor has she been restricted from performing medium work activity levels since the onset of her symptoms." *Id.* at 213. Dr. Ennis indicated that a current functional capacity evaluation would be helpful to fully document her limitations. *See id.* On July 9, 2003, Kemper sent plaintiff a letter indicating that her application for long term disability benefits was denied. *See id.* at 301-06. Specifically, Kemper concluded that

> the medical documentation submitted does not preclude you from performing the core elements of your own occupation as a Care Partner. In order to substantiate that you cannot, in fact, perform the essential duties of your occupation, your providers would have to submit physical findings such as loss of motion, nerve root involvement, loss of muscle strength and/or weakness, or any other diagnostic testing which documents the presence of significant impairments in physical functioning.

*Id.* at 304. Kemper also indicated that plaintiff's claim was untimely under the Plan provisions, because her application should have been made no later than April 23, 2002. *See id.* at 305.

Plaintiff, through counsel, filed an administrative appeal on September 8, 2003. On October 20, 2003, new counsel for plaintiff requested an extension to submit additional medical information. On November 4, 2003, counsel for plaintiff submitted two medical reports. The first was a report from Dr. Victor Gordon, D.O., who examined plaintiff on July 24, 2003. *See id.* at 520-26. Dr. Gordon indicated that plaintiff had limited range of motion in her lumbosacral spine, specifically, that her range of motion was limited to 20 degrees extension, 50 degrees flexion, and 25 degrees lateral flexion. *See id.* at 523. Plaintiff had normal gait and no muscle weakness, and electrodiagnostic testing showed no evidence of radiculopathy, plexopathy, or peripheral neuropathy. *See id.* at 523-24. Dr. Gordon suggested that plaintiff avoid activities which involved lifting or carrying more than 10

pounds. *See id.* at 525. The second report consisted of medical records of Dr. Noel Upfall, who examined plaintiff on February 13, March 12, August 20, September 3, and October 8, 2003. *See id.* at 527-31. Dr. Upfall diagnosed plaintiff as suffering from a ruptured disc and back pain. *See id.*

On October 17, 2003, as part of the administrative appeal, the file was examined by Dr. Martin Mendelssohn, M.D., an orthopaedic surgeon. *See id.* at 610-12. As had Dr. Ennis, Dr. Mendelssohn concluded that the medical evidence "fail[ed] to support functional impairment(s) that preclude work through the entire time period." *Id.* at 611. Dr. Mendelssohn concluded, based on "the fact that the claimant has no significant neurosurgical objective findings other than MRI findings which do not correlate with her clinical exam," that "a functional impairment that would preclude the claimant from her regular occupation as a Care Partner, which is a light physical exertion level, from 3/25/02 and beyond cannot be substantiated." *Id.* at 612. Dr. Mendelssohn prepared an addendum to his report on November 13, 2003, after considering the additional medical evidence submitted by plaintiff in connection with her administrative appeal. After reviewing Dr. Gordon's report, Dr. Mendelssohn affirmed his prior conclusion that plaintiff was not disabled. *See id.* at 613-15. On November 21, 2003, Kemper informed plaintiff, through a letter to her counsel, that her appeal was denied. Specifically, the Appeals Committee concluded that

> the submitted documents did not contain medical evidence (i.e. medical evidence revealing a functional impairment with respect to neurological physical examination findings, abnormal diagnostic findings, a Functional Capacity Evaluation, documentation revealing the intensity and severity of symptomatology, etc.) to substantiate a significant functional impairment that would have prevented your client from performing the essential functions of her own occupation.

*Id.* at 313.

On September 21, 2004, plaintiff commenced this action challenging the administrator's decision denying her benefits pursuant to § 502 of ERISA, 29 U.S.C. § 1132.

7

C.      *Method and Standard of Review*

Although the parties have filed cross-motions for summary judgment, the normal rules governing summary judgment under FED. R. CIV. P. 56 "are inapposite to ERISA actions and thus should not be utilized in their disposition." *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998). This is because a district court reviewing an administrator's decision in an ERISA case "may only consider evidence that was first presented to the administrator," *id.* at 618, while "Rule 56 is designed to screen out cases not needing a full factual hearing." *Id.* at 619. For this reason, "[t]o apply Rule 56 *after* a full factual hearing has already occurred before an ERISA administrator is . . . pointless." *Id.* Accordingly, a court should employ two steps in adjudicating a denial of benefits case under ERISA. First, with respect to the merits, a court should conduct a review "based solely upon the administrative record, and render findings of fact and conclusions of law accordingly. The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator." *Id.* Second, the court "may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.* The evidence contained in the administrative record which properly may be considered by a court includes any evidence submitted during the administrative appeals process. *See Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991).

With respect to the standard of review, in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), the Court held that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Id.* at 115.

Where the plan does give discretionary authority, however, a court "reviews the administrator's decision to deny benefits using 'the highly deferential arbitrary and capricious standard of review.'" *Gismondi v. United Technologies Corp.*, 408 F.3d 295, 298 (6th Cir. 2005) (quoting *Killian v. Healthsource Provident Adm'rs, Inc.*, 152 F.3d 514, 520 (6th Cir. 1998) (citing *Firestone Tire*, 489 U.S. at 115)). Here, plaintiff does not dispute that the Plan grants the administrator discretionary authority, and that the arbitrary and capricious standard applies. *See* Pl.'s Br., at 9; Compl., Ex. A, at 24 (Plan language).

The arbitrary and capricious "standard is extremely deferential and has been described as the least demanding form of judicial review." *McDonald v. Western-Southern Life Ins. Co.*, 367 F.3d 161, 172 (6th Cir. 2003). As the court explained in *Gismondi*:

> Under this deferential standard, we will uphold a benefit determination if it is rational in light of the plan's provisions. When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious. Indeed, we must accept a plan administrator's rational interpretation of a plan even in the face of an equally rational interpretation offered by the participants.

*Gismondi*, 408 F.3d at 298 (citations and internal quotations omitted).

D.   *Short-Term Disability Benefits*

It is not clear in her complaint whether plaintiff is raising a claim with respect to the denial of her short term disability benefits. In its motion for summary judgment, defendants raise several arguments as to why plaintiff is not entitled to short term benefits. Plaintiff does not address these arguments in her motion, nor does she offer any argument relating to the short term benefits issue. Because plaintiff has failed to address the issue, to the extent that the complaint raises a claim relating to short term benefits, the Court should enter judgment in favor of defendants on that claim. *See Whitmire v. Terex Teletext, Inc.*, 390 F. Supp. 2d 540, 548 (E.D. Tex. 2005); *Kaupus v. Village of*

*University Park*, No. 02 C 3675, 2003 WL 22048173, at *11 (N.D. Ill. Sept. 2, 2003).

E.     *Long-Term Disability Benefits*

   1.     *Timeliness of Plaintiff's Proof of Loss*

Defendants first contend that the Plan administrator correctly determined that plaintiff's application for benefits was untimely. Plaintiff contends that the application was timely, and alternatively that defendants are estopped from asserting untimeliness as a basis for denying the claim. The Court should conclude that plaintiff's claim was untimely, and that defendants were not estopped from relying on plaintiff's untimeliness in denying her application.

Plaintiff cannot show that the administrator acted arbitrarily and capriciously in determining that her long term disability benefit claim was untimely. The Plan defines the benefit qualifying period as 180 days from the date of disability. *See* Compl., Ex. A, at 9. With respect to long term disability benefits, the plan also provides that a claimant must submit proof of disability "[n]ot later than 30 days prior to the end of the Benefit Qualifying Period." *Id.* at 14. Thus, plaintiff was required to submit proof of her disability within 150 days (*i.e.*, 30 days prior to the expiration of the 180 day qualifying period) of her disability. Because her disability commenced on September 24, 2001, she was required to submit proof of her disability by February 21, 2002. There is no question that she did not do so, and thus her claim was untimely. *See Plain v. AT & T Corp.*, 424 F. Supp. 2d 11, 16 (D.D.C. 2006); *Leit v. Revlon, Inc.*, 85 F. Supp. 2d 1293, 1297 (S.D. Fla. 1999); *Mitchell v. First UNUM Life Ins. Co.*, 65 F. Supp. 2d 686, 699 (S.D. Ohio 1998).[4] Plaintiff offers two arguments to

---

[4]In *UNUM Life Ins. Co. of Am. v. Ward*, 526 U.S. 358 (1999), the Court held that California's notice-prejudice rule, which precluded an insurer from denying a claim based on untimely notice when the insurer suffered no prejudice as a result of the delay, was not preempted by ERISA. This rule affords no help to plaintiff here, as Michigan insurance law does not contain a similar prejudice requirement. *See Wineholt v. Cincinnati Ins. Co.*, 179 F. Supp. 2d 742, 747 (W.D. Mich. 2001); *Dellar v. Frankenmuth Mut. Ins. Co.*, 173 Mich. App. 138, 145, 433 N.W.2d

attempt to rebut this conclusion.  Each of these arguments is without merit.

Plaintiff first argues that defendant is estopped from relying on plaintiff's untimeliness because defendant failed to send her the required forms until April 2003.  To establish estoppel,

> plaintiff must show that: (1) there was conduct or language amounting to a representation of material fact; (2) the party to be estopped was aware of the true facts; (3) the party to be estopped must intend that the representation be acted on, or plaintiff must reasonably believe that the party to be estopped so intends; (4) plaintiff must be unaware of the true facts; and (5) plaintiff must reasonably or justifiably rely on the representation to his detriment.

*Mitchell*, 65 F. Supp. 2d at 698 (citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 403-04 (6th Cir. 1998) (en banc); *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir. 1991)).  Plaintiff claims only that she was not provided the application form for long term disability benefits; she does not allege that she was misled in any way by any misstatement of fact by defendants.  Further, plaintiff cannot show reasonable reliance because the summary plan description expressly provides the course of action a claimant is to take if she does not receive the forms for establishing proof of loss.  Specifically, the plan description states that "[o]nce we are notified, you will be provided forms for furnishing us with proof that you are unable to work due to sickness or injury.  If you do not receive these forms within 15 days after notifying us of your claim, you or your representative can send us written proof . . . of your claim without continuing to wait for our forms."  Compl., Ex. A, at 14.  In short, the record fails to establish either a misstatement of fact by defendants or reasonable reliance by plaintiff.  Rather, the record establishes simply that plaintiff did not file a timely proof of loss because she did not consider seeking long term disability benefits until after her worker's compensation expired in April 2003.  Thus, plaintiff has failed to make out an equitable estoppel claim.

---

380, 383 (1988).

Second, plaintiff contends that her proof of loss was timely because the plan provides that "[i]f it was not reasonably possible to provide proof that you were unable to work due to sickness or injury within [the applicable] time frame, it will not affect the validity of your claim as long as you provide such proof as soon as reasonably possible thereafter." Compl., Ex. A, at 14. Plaintiff does not explain, however, why it was not reasonably possible to provide the required proof of loss. The bulk of the medical records relating to plaintiff's injury and treatment were available to her well before she actually applied for long term disability benefits. Further, with the exception of Dr. Gordon's report, the medical reports were either available before the expiration of the time frame in which plaintiff had to submit proof of loss, or although available only after that period offered no medical information which was different from that contained in the earlier reports. Plaintiff notes that the medical records reflect that she was depressed due to her pain and restrictions, but plaintiff presents no argument as to the severity of this depression or the extent to which it prevented her from providing timely proof of loss. In these circumstances, the administrator's decision that plaintiff failed to provide timely proof of loss was not arbitrary and capricious. *See Mitchell*, 65 F. Supp. 2d at 699 ("[T]here is no evidence that it was not possible for plaintiff to submit notice and proof of claim within the time limits when notice and proof were otherwise due.").

2. *Denial of Benefits*

Alternatively, the Court should conclude that the administrator did not arbitrarily and capriciously in determining that plaintiff was not disabled. Plaintiff offers two arguments to support her claim that the administrator's decision was arbitrary and capricious. First, she contends that the administrator used the wrong disability standard. Second, she contends that the substantive finding of no disability was arbitrary and capricious. Each of these arguments is without merit.

a. *Disability Standard Used by the Administrator*

12

Plaintiff first contends that the administrator used the wrong standard for assessing disability. Specifically, plaintiff asserts that the administrator's denial, based on the reviewing physicians' determinations that there was no objective evidence of a disability, was arbitrary and capricious because an objective evidence standard is neither stated nor defined in the plan. However, this argument is belied by the plan language, which requires a claimant to provide "proof" that she is unable to work. As defendants correctly note, "proof" connotes an objectively verifiable set of facts. *See* BLACK'S LAW DICTIONARY 1215 (6th ed. 1990) (defining proof as "the establishment of fact by evidence. . . . The establishment by evidence of a requisite degree of belief concerning a fact[.]"); MIRRIAM-WEBSTER'S ON-LINE DICTIONARY, at www.m-w.com/dictionary/proof (defining proof as "the cogency of evidence that compels acceptance by the mind of a truth or a fact[;] . . . something that induces certainty or establishes validity.").

For this reason, the courts that have considered the issue find no abuse of discretion in a plan administrator's determination that a proof of loss requirement is sufficient to establish a requirement of objective evidence. As another court has explained:

> It is difficult to understand how a long term-disability plan would survive if Plaintiff's assessment of what is required in the way of proof was correct. The Plan would be open to fraudulent abuse if all that was required for receipt of LTD benefits was the subjective complaints of a claimant. A plan administrator would be prohibited from denying any claim by a claimant who insisted that her conditions were severe enough to prevent her from working. Claims of those who exaggerate or even fabricate their claims of disability would be treated the same as those who present valid medical corroboration of medical deficits. Under such a system, no claims could be denied. For these reasons alone, it is reasonable for a Plan to require "objective medical information" in support of a claim for long-term disability as Harris did in deciding Plaintiff's claim.
> Case law supports the conclusion that it is reasonable for a plan administrator to require objective medical evidence even where the plan does not specifically contain such a requirement. Where a plan requires proof of continued disability, "the very concept of proof connotes objectivity." *Maniatty v. UNUM Provident Corp.*, 218 F.Supp.2d 500, 504 (S.D.N.Y.2002), *aff'd*, 62 Fed.Appx. 413, 2003 WL 21105390 (2d Cir.), *cert. denied*, 540 U.S. 966, 124 S.Ct. 431, 157 L.Ed.2d 310 (2003). "Were an

13

> opposite rule to apply, LTD benefits would be payable to any participant with subjective and effervescent symptomology simply because the symptoms were first passed through the intermediate step of self-reporting to a medical professional." *Coffman v. Metro., Life Ins. Co.*, 217 F.Supp.2d 715, 732 (S.D.W.Va.2002), *aff'd*, 77 Fed.Appx. 174, 2003 WL 22293610 (4th Cir.2003). In the absence of a requirement of objective evidence, the review of claims for long-term disability benefits would be "meaningless because a plan administrator would have to accept all subjective claims of the participant without question." *Williams v. UNUM Life Ins. Co. of Am.*, 250 F.Supp.2d 641, 648 (E.D.Va.2003). Furthermore, the fiduciary role of the plan administrator of scrutinizing claims, protecting the assets of a plan, and paying legitimate claims would be seriously compromised. *Coffman*, 217 F.Supp.2d at 732; *see also Bailey v. Provident Life & Accident Ins. Co.*, No. 3:99-CV-394, 2000 WL 33980014, at *4 (N.D.Fla. June 13, 2000) ("[R]eliance on [subjective] complaints, without more, would result in insurance companies paying virtually all claims. [The insurance company] owes its policy-holders a duty to investigate and seek objective support for the claimant's subjective complaints.").

*Hufford v. Harris Corp.*, 322 F. Supp. 2d 1345, 1355-56 (M.D. Fla. 2004). Accordingly, the Court should conclude that the administrator did not abuse its discretion by interpreting the plan to require objective evidence that plaintiff was unable to work.

### b. *Application of the Disability Standard to Plaintiff*

Plaintiff also argues that the administrator's decision that she could perform her job as a Care Partner was arbitrary and capricious because all of her treating doctors indicated that she was restricted from lifting, bending, and twisting, and such actions were necessary to her job. As noted above, however, the administrator rejected plaintiff's claim because there was no objective evidence to verify these restrictions. However, even taking these restrictions as correct, plaintiff cannot show that the administrator's decision was arbitrary and capricious. The only two tasks reflected in the job description provided by plaintiff which implicate the restrictions imposed by her doctors are "occupied bed making" and, possibly, "bath." *See* AR, at 538-41. However, the job description itself does not more fully explain these tasks, and there is nothing to indicate that plaintiff would be required to perform these tasks without assistance, nor that they would require her to lift more than

20-25 pounds. Further, although they imposed some restrictions none of plaintiff's treating physicians opined that plaintiff was disabled either from her job or from work in general, nor did they explain with objective evidence how plaintiff's impairment prevented her from performing the essential functions of her job. *See Boone v. Liberty Life Assur. Co. of Boston*, 161 Fed. Appx. 469, 473-74 (6th Cir. 2005); *Storms v. Aetna Life Ins. Co.*, 156 Fed. Appx. 756, 758-59 (6th Cir. 2005); *Boardman v. Prudential Ins. Co. of Am.*, 337 F.3d 9, 16-17 (1st Cir. 2003). And, the reviewing physicians based their determination on a consideration of both the medical evidence and plaintiff's job description as reflected in either the information provided by plaintiff or in the *Dictionary of Occupational Titles* ("DOT"). *See* AR, at 211. *See generally*, *White v. HealthSong Long-Term Disability Plan*, 320 F. Supp. 2d 811, 819 (W.D. Ark. 2004) (administrator may rely on DOT job description in denying claim) (citing cases). In short, although plaintiff views the evidence differently than did the administrator, the record does not establish that the administrator acted arbitrarily and capriciously in concluding that the medical evidence failed to substantiate plaintiff's claim that her back impairment prevented her from performing her job as a Care Partner.

F.     *Conclusion*

In view of the foregoing, the Court should conclude that the administrator did not act arbitrarily and capriciously in determining (a) that plaintiff's proof of loss was untimely, and (b) that plaintiff was not disabled within the meaning of the Plan. Accordingly, the Court should conclude that plaintiff is not entitled to relief under § 502 of ERISA, and should enter judgment in favor of defendants.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C.

§ 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

                          s/Paul J. Komives  
                          PAUL J. KOMIVES  
                          UNITED STATES MAGISTRATE JUDGE

Dated: 1/12/07

> The undersigned certifies that a copy of the foregoing order was served on the attorneys of record by electronic means or U.S. Mail on January 12, 2007.
>
>                         s/Eddrey Butts  
>                         Case Manager